**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
DR. LISA ROSENBERG,                                     :
                                                        :
                        Plaintiff,                      :          Civil Case No.:
                                                        :
                v.                                      :          **COMPLAINT**
                                                        :
NEW YORK QUEENS MEDICINE AND                            :          **Jury Trial Demanded**
SURGERY, P.C. d/b/a NEW YORK-                           :
PRESBYTERIAN MEDICAL                                    :
GROUP/QUEENS and DR. DANIEL SKUPSKI, in                 :
his individual and professional capacities,             :
                                                        :
                        Defendants.                     :
------------------------------------------------------------- X

Dr. Lisa Rosenberg ("Plaintiff" or "Dr. Rosenberg") alleges:

## PRELIMINARY STATEMENT

1.      The laudable #MeToo movement has taught that sexual harassment and unwanted sexual advances are pervasive.  This is a reality for women that is virtually unescapable.

2.      Powerful men in all walks of life have used physical force and threats of retaliation to coerce unwilling women into engaging in sexual activity.  These threats are particularly disturbing when the man involved controls the career of the woman with whom he wants to have sex.  In such circumstances, women are forced to make an evil choice: involuntarily submit to uninvited sexual demands or suffer career debilitating retribution.

3.      Plaintiff Dr. Rosenberg, a gynecologist at New York Presbyterian Medical Group/Queens ("Presbyterian" or the "Hospital"), was put in exactly this position by Defendant Dr. Daniel Skupski, Dr. Rosenberg's supervisor and the Chair of the Hospital's OB-GYN Department.

4.      In December 2016, Dr. Skupski made inappropriate sexual advances towards Dr.

Rosenberg, telling her that she was "the prettiest attending physician on staff," and attempted to

convince Dr. Rosenberg to consume alcohol and have sex with him by, *inter alia*, stating:   "Why

don't you have 2-3 more pinot grigios?  I can drive you home."  Dr. Skupski also attempted to

grab Dr. Rosenberg's breasts and succeeded in making physical contact with her breasts, and

also grabbed Dr. Rosenberg's rear end.  Dr. Rosenberg rejected Dr. Skupski's advances and,

because she refused to have sex with him, suffered blatant retaliation.

5.      In October 2017, Dr. Rosenberg complained to Human Resources ("HR") about

unrelated staffing issues.  In direct response to this complaint, HR outrageously and falsely

asserted that a patient had complained that Dr. Rosenberg had alcohol on her breath.  This was a

completely fabricated claim – Dr. Rosenberg has never practiced while impaired and, prior to

this purported complaint, had never been accused of practicing while impaired at any time during

her 35-year career.  To date, Dr. Rosenberg has been provided no evidence whatsoever that this

complaint ever actually occurred, and the accounts of this purported complaint that she has been

provided are inconsistent.  The purported complainant was not and has not been identified, and

no written complaints, notes or call logs evidencing a verbal complaint have been provided to

Dr. Rosenberg.  Moreover, Dr. Rosenberg was permitted to practice the entire morning, after the

complaint was purportedly made.  Obviously, if a credible complaint had actually been made,

Dr. Rosenberg would have been removed from her post immediately.

6.      Dr. Rosenberg was then confronted about this purported complaint by Dr.

Skupski, who ominously stated:  "***Maybe you made the wrong decision at the Christmas party***,"

in reference to the fact that Dr. Rosenberg had rejected Dr. Skupski's prior sexual advances.  Dr.

Rosenberg pled innocence and demanded a breathalyzer test, in response to which ***Dr. Skupski***

*grinned and began to unzip his pants, crudely suggesting that she treat his penis as a*
*breathalyzer and perform oral sex on him*.

7.     When Dr. Rosenberg refused to perform oral sex on Dr. Skupski, he demanded that she report to Employee Health Services ("EHS").  Once at EHS, Dr. Rosenberg agreed without protest to a medical evaluation and blood and urine testing, and specifically requested  a blood and urine test for alcohol.  Records from EHS establish that Dr. Rosenberg was not in any way impaired.  The only thing Dr. Rosenberg tested positive for were certain metabolites found in medicines that she had been prescribed.

8.     *Incredibly, despite the fact that the purported basis for the visit to EHS was because a patient supposedly complained that Dr. Rosenberg had alcohol on her breath, no test for alcohol was performed.*  Plainly, Defendants knew that Dr. Rosenberg was not impaired and intentionally failed to test her for alcohol because they knew she would test negative. Indeed, EHS did not even refer Dr. Rosenberg to a professional to observe her and determine whether she was in any way impaired.

9.     Nevertheless, Defendants have advised Dr. Rosenberg that she will not be permitted to return to work, and have refused her repeated requests to return.

10.     Indeed, Defendants have repeatedly confirmed that they will only permit Dr. Rosenberg to return to work if she falsely admits to having practiced while impaired.

11.     Defendants' refusal to permit Dr. Rosenberg to return to work has and will continue to put the health and safety of her patients at risk, and many of her patients have complained to Dr. Rosenberg that they do not feel safe being treated by the doctors that Presbyterian has chosen to replace her.

12.     Nevertheless, Presbyterian has refused to even permit Dr. Rosenberg to assist in the transition of her patients to doctors of their choosing.

13.     Instead, Presbyterian has allowed an unqualified office manager to call Dr. Rosenberg's patients who have abnormal mammograms (and therefore are most at risk for breast cancer), and refer those patients only to doctors or physician's assistants within the Presbyterian system.  This is done without any input from Dr. Rosenberg even though she has expressed to Presbyterian that there are more qualified specialists who should be treating her patients.

14.     Upon information and belief, Dr. Rosenberg is not the only female employee of Presbyterian that has been sexually harassed by Dr. Skupski.

15.     Nevertheless, and despite the fact that the Hospital was on notice of Dr. Rosenberg's claims as early as October 2017, Dr. Rosenberg received a letter dated January 26, 2018, which stated that her allegations against Dr. Skupski "***will*** be thoroughly investigated," which indicates that, as of January 26, 2018, the Hospital had done absolutely nothing to investigate the sexual harassment committed against Dr. Rosenberg.  This is precisely the sort of conduct (turning a blind eye) that enabled Harvey Weinstein to reportedly sexually harass and assault dozens of women over a period of many years.

16.     In addition, the Hospital denied Dr. Rosenberg's request to take leave pursuant to the Family and Medical Leave Act to take care of her ailing mother, and instead insisted that she sign a letter requesting leave to "address personal medical concerns to ensure that the care that [she] renders to patients continued to meet or exceed the standard of care."  Presbyterian advised that if Dr. Rosenberg did not agree to its language, it would deny her leave request and she would be reported to the Office of Professional Medical Conduct ("OPMC").  Needing to care for her mother, and under the threat of being speciously reported to OPMC, Dr. Rosenberg had

4

no choice but to sign the letter as the Hospital demanded.  However, unbeknownst to Dr. Rosenberg at the time, the Hospital had either already, or briefly thereafter, reported her to the OPMC.

17.     Moreover, Defendants' actions were taken in breach of various written and signed agreements between the Hospital and Dr. Rosenberg.

18.     Accordingly, Dr. Rosenberg brings claims against Defendants for violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* (the "FMLA"), the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* (the "NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.* (the "NYCHRL"), as well for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract and conversion.  Dr. Rosenberg seeks injunctive and equitable relief, as well as monetary damages, to redress the unlawful employment practices committed by Defendants against her, including, *inter alia*, unlawful sexual harassment, interference, retaliation and perceived disability discrimination.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has subject matter jurisdiction over this action because this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1981 and the FMLA.

20.     Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Plaintiff's related claims under the NYSHRL and NYCHRL, as well as her claims for breach of contract.

21.     Venue is proper pursuant to 28 U.S.C. § 1391.

## ADMINISTRATIVE REQUIREMENTS

22.     Contemporaneous with the filing of this Complaint, Dr. Rosenberg will file a charge of discrimination and retaliation arising out of the facts described herein with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq*., as amended by the ADA Amendments Act (the "ADA").  When the EEOC issues Dr. Rosenberg's notice of right to sue, she will seek leave to amend this Complaint to add claims for Defendants' violations of Title VII and the ADA.

23.     Pursuant to NYCHRL § 8-502, Dr. Rosenberg will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of that section.

24.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

25.     Plaintiff Dr. Lisa Rosenberg ("Dr. Rosenberg") is a resident of Nassau County, New York.  Plaintiff, at all relevant times, was and is an "employee" as defined by all relevant statutes.

26.     Defendant New York Queens Medicine and Surgery, P.C. d/b/a New York-Presbyterian Medical Group/Queens is a domestic corporation headquartered at 56-45 Main Street, Flushing, New York 11355.  The Medical Group, at all relevant times, was and is an "employer" as defined by all relevant statutes.

27.     Defendant Dr. Daniel Skupski was and is Plaintiff's direct supervisor.  Dr. Skupski is the Chair of the Department of Obstetrics and Gynecology ("Department") at the Hospital.  Dr. Skupski's primary work location is in Queens, New York, and he is a resident of New York State.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

28.     Dr. Rosenberg is a former Lieutenant and medical officer in the U.S. Navy who was honorably discharged from her service.

29.     Prior to being unlawfully removed from her practice by the Hospital, Dr. Rosenberg did not once – in more than 35 years of practice – ever have her hospital privileges withdrawn or restricted.  Dr. Rosenberg also has no history whatsoever of any alcohol or drug abuse of any kind.

30.     Dr. Rosenberg opened her current practice in 1987 and, for nearly 30 years, provided exceptional medical treatment for her patients.  Her expertise has been recognized by the medical community in a variety of ways.  Indeed, Dr. Rosenberg was appointed to serve as the Leader of District 2 of the American College of Obstetricians and Gynecologists.

31.     In July 2016, based in no small part on her stellar reputation, Presbyterian sought to "buy out" Dr. Rosenberg's practice.

32.     Following negotiations, the parties entered into various agreements, including an employment agreement executed on June 3, 2016 (the "Employment Agreement").  Pursuant to the Employment Agreement, Plaintiff became employed by the Medical Group as an attending physician in the Department.

33.     The Employment Agreement is for a five-year term, beginning July 1, 2016 and ending June 30, 2021.

34.     The Employment Agreement provides that Dr. Rosenberg is to be paid $250,000 per year (plus additional compensation in the event that Dr. Rosenberg's Relative Value Units exceeds 5,000 in any given year).

35.     The Employment Agreement also provides various other benefits, including, *inter alia*, malpractice insurance, medical insurance and pension benefits.

36.     Dr. Rosenberg's employment with Presbyterian was not "at will."  Rather, the Employment Agreement only permitted the Hospital to terminate Dr. Rosenberg for specified reasons.

37.     On August 1, 2016, Dr. Rosenberg and the Hospital entered into a separate contract under which the Hospital agreed to cover the cost of the rent at Dr. Rosenberg's offices until April 30, 2021 (the "Sublease Agreement").  The Hospital has no right to terminate the Sublease Agreement for any reason.

38.     Finally, Dr. Rosenberg and the Hospital entered into a Medical Services Agreement, which requires the Hospital to provide Dr. Rosenberg with various benefits and staff in order to maintain her practice.

## II.     DR. ROSENBERG IS SEXUALLY HARASSED BY DR. SKUPSKI

39.     In December 2016, during the Hospital's annual Christmas party, Dr. Skupski made inappropriate sexual advances on Dr. Rosenberg.

40.     Specifically, Dr. Skupski told Dr. Rosenberg that he believed that she was "the prettiest attending physician on staff."

41.     He then inappropriately caressed Dr. Rosenberg's arm and inquired about her marital status.

42.     Dr. Rosenberg resisted Dr. Skupski's advances and told him that he was making her uncomfortable.

43.     Nonetheless, Dr. Skupski persisted and began to try to pressure Dr. Rosenberg into consuming alcohol and having sex with him by, *inter alia*, stating:   "Why don't you have 2-3 more pinot grigios?  I can drive you home."

44.     At the same time, Dr. Skupski attempted to grab Dr. Rosenberg's breasts and succeeded in making physical contact with her breasts with his hand.

45.     Dr. Rosenberg again rejected Dr. Skupski's sexual advances.  However, he would not take 'no' for an answer, and later that evening grabbed Dr. Rosenberg's rear end while group pictures were being taken.

46.     Following Dr. Rosenberg's rejection of Dr. Skupski's sexual advances, Dr. Skupski became cold and aloof towards Dr. Rosenberg and began to treat her with disdain.

## III.     THE HOSPITAL'S SHAM 'INVESTIGATION' INTO PURPORTED ALLEGATIONS OF IMPAIRMENT

47.     On October 6, 2017, Janet Weiner, a Presbyterian Human Resources representative, was visiting Dr. Rosenberg's office to meet with a newly hired employee.

48.     Dr. Rosenberg took the opportunity to complain to Ms. Weiner about the inadequate staffing provided to her by the Hospital.  Indeed, the Hospital's provision of inadequate staff, as well as the associated risks to Dr. Rosenberg's patients, had been raised by Dr. Rosenberg on multiple prior occasions.  Nothing had been done to remedy the staffing situation, which itself was a breach of the Employment Agreement.

49.     Ms. Weiner responded by informing Dr. Rosenberg that a patient had purportedly complained earlier that morning that Dr. Rosenberg smelled of alcohol.

50.     Dr. Rosenberg has been provided no evidence whatsoever that this complaint ever actually occurred.  The purported complainant was not and has not been identified, and no written complaints, notes or call logs evidencing a verbal complaint have been provided to Dr. Rosenberg.

51.     Even assuming that this complaint was actually made, it obviously was not credible.  If anyone at Presbyterian actually thought that Dr. Rosenberg might be practicing under the influence of alcohol, Dr. Rosenberg would not have been permitted to continue to see patients the rest of the morning following the purported complaint.

52.     Dr. Rosenberg categorically denied practicing while impaired and demanded a breathalyzer test, but Ms. Weiner simply left the room.

53.     After her conversation with Ms. Weiner, Dr. Rosenberg met with Dr. Skupski, who reiterated the claim that a patient had complained that Dr. Rosenberg had alcohol on her breath.

54.     Dr. Skupski then ominously stated:  "***Maybe you made the wrong decision at the Christmas party***," in reference to the fact that Dr. Rosenberg had rejected Dr. Skupski's prior sexual advances.

55.     Dr. Rosenberg again demanded a breathalyzer test, in response to which ***Dr. Skupski grinned and began to unzip his pants, crudely suggesting that she treat his penis as a breathalyzer and perform oral sex on him***.

56.     Dr. Rosenberg, horrified, exclaimed, "You are disgusting!" and demanded a breathalyzer, urine test or blood test for alcohol.

57.     Dr. Skupski demanded that Dr. Rosenberg report to Employee Health Services to undergo a medical evaluation, and, in the full view of her patients and staff, had Dr. Rosenberg escorted to EHS.

58.     Before Dr. Rosenberg even arrived at EHS, Dr. Skupski reported to EHS that Dr. Rosenberg "was reported by other ***employees*** to have a possible smell of alcohol on breath while at work today."  This, of course, was contrary to the prior claim that a single patient purported to smell alcohol on Dr. Rosenberg's breath.

59.     Once at EHS, Dr. Rosenberg agreed without protest to a medical evaluation and blood and urine testing.  Records from EHS establish that Dr. Rosenberg was not in any way impaired.  Indeed, she was described as "[a]lert, oriented x 3" with "no tremors and normal gait." The only reference to slurred speech in the EHS states "slurred **(?)** speech," indicating no finding of slurred speech.[1]

60.     Incredibly, despite the fact that the entire basis for the visit to EHS was supposedly because a patient (or "employees") had complained that Dr. Rosenberg had alcohol on her breath, ***no test for alcohol was performed*** despite the fact that alcohol is detectable through a urine test for up to 80 hours.

61.     If the Hospital actually believed that Dr. Rosenberg was practicing medicine under the influence of alcohol, it obviously would have tested her for alcohol.

62.     Moreover, after taking various tests, Dr. Rosenberg was permitted to drive home, which would never have been permitted if anyone actually believed that she was impaired.

---

[1]     In any event, it is well-established that stress and anxiety can cause slurred speech, and Dr. Rosenberg, having been falsely accused of practicing while impaired, was certainly experiencing tremendous stress and anxiety while at EHS.

Finally, Dr. Rosenberg was asked to take a week off from work to await the results of the tests that were taken.

63.     The only thing Dr. Rosenberg tested positive for were certain metabolites found in medicines ***that she had been prescribed***.

64.     Nevertheless, the Hospital advised Dr. Rosenberg that she would not be permitted to return to work, and has refused her repeated requests to return.

65.     Indeed, the Hospital will only permit Dr. Rosenberg to return to work if she admits having practiced while impaired, which the Hospital knows she will never do because she was never practicing while impaired.

## IV.    DR. ROSENBERG IS EVALUATED BY MULTIPLE DOCTORS, ALL OF WHOM CONFIRM THAT SHE IS FIT TO PRACTICE MEDICINE

66.     Following the events of October 6, 2017, Dr. Rosenberg sought out evaluations from multiple doctors in order to demonstrate to the Hospital that she was not in any way impaired and should be permitted to return to work.

67.     Dr. Alexander E. Weingarten, who has treated alcohol addiction for almost 35 years and is well aware of the signs and symptoms that are present in someone who actively engages in the frequent use of alcohol, wrote the following in a letter dated October 28, 2017:

(i)     "I have known [Dr. Rosenberg] for approximately 40 years both as a friend and as a professional colleague;"

(ii)    "I have never known her to engage in the use of alcohol other than occasional social events;"

(iii)   "She certainly has never abused alcohol while on duty as a physician;"

(iv)    "I . . . have never personally seen or heard of any accusations by any staff member lodged against her regarding being impaired by alcohol or any evidence of using alcohol while on duty;"

      (v)     In physically examining Dr. Rosenberg, "there were no signs of any impairment which could be attributed to alcohol;" and

      (vi)    "I can state with a reasonable degree of medical certainty that Dr. Lisa Rosenberg remains an outstanding physician who has given excellent medical care to her patients for well over 35 years.  She has never been accused of being impaired by alcohol and my association with her for over 40 years bears this out."

68.     On October 29, 2017, psychologist Dr. Robert H. Fox, who treated Dr. Rosenberg in 2016 and again in October 2017, wrote:

      (i)     "At no time, either in the past or currently, was there any evidence, nor impairment, related to substance abuse or addiction;"

      (ii)    "It is my professional opinion, therefore, after seeing Dr. Rosenberg in the past year and again this past week, [that] she demonstrates good judgment, responsibility and no signs of any substance abuse;" and

      (iii)   "She appears to be fit to resume her full time OB-GYN practice as soon as possible."

69.     Another psychiatrist who has treated Dr. Rosenberg for the past two years, wrote in a letter dated October 31, 2017:

      (i)     "I have not observed any cognitive difficulties nor problems with judgment;"

      (ii)    "I have never noticed any behaviors that would suggest overuse of her prescribed medications or inappropriate use of alcohol;" and

      (iii)   "I have never observed any behavior that would indicate that Dr. Rosenberg has any difficulty functioning as a physician."

70.     Finally, on November 3, 2017, Dr. Ralph Wharton, ***Presbyterian's own psychiatrist***, wrote:

13

(i)     "Dr. Lisa Rosenberg was seen by me today, for a brief exam and assessment.  She was punctual (in fact early), well dressed and her usual articulate self;"

(ii)    "She appeared in excellent health, well nourished, and her congenial self-composed professional physician;"

(iii)   "Her speech was clear, goal directed and very responsive to my questions.  She was well rested and composed in manner.  Her gait was normal, and steady.  She walked easily and turned without hesitation.  There were no signs of tremor;"

(iv)    "She was certainly well oriented to time, place, and person;"

(v)     "Brief neurological exam indicated no evidence of any impairment whatsoever;" and

(vi)    "Exam: normal 60-plus year old physician."

71.    Despite the fact that Presbyterian's own psychiatrist confirmed that there was no evidence of any impairment, the Hospital refuses to permit Dr. Rosenberg to return to work unless she falsely states that she was impaired.  This is a blatant and indefensible breach of Dr. Rosenberg's Employment Agreement.

72.    Dr. Rosenberg even agreed to submit to an evaluation by a physician of Defendants' choosing, instruct any treating physicians to cooperate with any inquires Defendants may have and submit to periodic drug testing.  Defendants rejected this proposal, which demonstrates their actual motives – *i.e.*, to refuse under any circumstances to bring Dr. Rosenberg back.

## V.    DR. ROSENBERG'S FAMILY AND MEDICAL LEAVE ACT RIGHTS ARE VIOLATED AND SHE IS BASELESSLY REPORTED TO OPMC

73.    In addition to all of the foregoing, throughout October 2017, the Hospital repeatedly advised that, unless Dr. Rosenberg took a voluntary leave from the medical staff, she

would be suspended, which would, according to the Hospital, likely result in a report to the Office of Professional Medical Conduct.

74. As such, and because her mother was suffering from significant health problems, on October 25, 2017, Dr. Rosenberg requested leave pursuant to the FMLA to take care of her ailing mother.

75. Dr. Rosenberg's mother is suffering from various medical conditions and is terminally ill. She needed assistance feeding herself, shopping for food, showering and traveling to and from doctors' appointments. Dr. Rosenberg submitted a letter to the Hospital that stated:

> I am requesting a leave of absence from the medical staff at New York Presbyterian Hospital. My mother is seriously ill and I have to attend to her needs. I am requesting to take leave under FMLA. I expect to be out two to three weeks.

76. Dr. Rosenberg also submitted FMLA paperwork detailing her mother's health condition.

77. The Hospital flat out and unlawfully rejected Dr. Rosenberg's request, insisting instead that she sign a letter requesting leave to "address personal medical concerns to ensure that the care that [she] renders to patients continued to meet or exceed the standard of care."

78. The Hospital also required Dr. Rosenberg to exclude the portion of the letter stating that she would only be out for two to three weeks.

79. Presbyterian advised that if Dr. Rosenberg did not agree to its language, it would deny her leave request and she would be reported to the OMPC.

80. Needing to care for her mother, and under the threat of being speciously reported to the OPMC, Dr. Rosenberg had no choice but to sign the letter as the Hospital demanded.

81. Unbeknownst to Dr. Rosenberg at the time, the Hospital had either already, or briefly thereafter, reported her to the OPMC.

15

82.     Moreover, Defendants terminated the Medical Service Agreement that they had entered into with Dr. Rosenberg.  The Services Agreement required Defendants to pay for certain staff members to assist Dr. Rosenberg.  In the absence of the Services Agreement, Dr. Rosenberg will be left with no means to support a secretarial staff, and, as a practical matter, will be stripped of any ability to maintain her current practice.  Thus, it is evident that Defendants have no intention of allowing Dr. Rosenberg to ever return to work, and have decided instead to simply steal Dr. Rosenberg's practice.

## VI.     THE HOSPITAL VITIATES DR. ROSENBERG'S REPUTATION AND DESTROYS HER ABILITY TO PRACTICE MEDICINE IN THE FUTURE

83.     Almost immediately after the fabricated charges of impairment, the Hospital began taking actions that would ultimately ensure that Dr. Rosenberg's practice would be unsalvageable even if she were ever permitted to return.

84.     The patients scheduled to see Dr. Rosenberg the week of October 9, 2017 were rescheduled for the following week, at which point they still could not see Dr. Rosenberg.

85.     Then, the Hospital began sending out fraudulent notices to patients with appointments in order to deceive patients into believing that Dr. Rosenberg would actually be treating them.  For example:

> Hello [Patient Name],
>
> I look forward to seeing you at your appointment. Does this time still work for you?  If not, please let me know so I can see another patient that needs help. My team is happy to find a better time for you.
>
> [Date] at [Time]
> Lisa Rosenberg, MD
> OB/GYN Fresh Meadows 61-34 188th St.
> 61-34 188th St.
> Fresh Meadows, NY 11365-2719

> I appreciate your feedback. By telling me if you can or cannot make it, you help make sure that all patients are getting the care they need. Thank you for taking the time to make health care work well for everyone.
>
> Thank you,
> Lisa Rosenberg, MD

86.     Of course, when her patients arrived, they learned that Dr. Rosenberg would not be treating them and had mysteriously disappeared without explanation.

87.     On or about November 20, 2017, Dr. Rosenberg learned that certain of her patients were being scheduled for appointments on November 27, 2017, even though the Hospital was still barring Dr. Rosenberg from returning to work at that time.

88.     Dr. Rosenberg also learned that other patients were being told that she would be "unavailable," for undisclosed reasons, for three months.

89.     On December 6, 2017, Dr. Rosenberg again requested that the Hospital permit her to return to work, and again Presbyterian denied her the ability to do so.

90.     The following day, Presbyterian outrageously told Dr. Rosenberg (through counsel) that if she had any questions about the status of her patients, she would have to direct them to Dr. Skupski.

91.     The Hospital's conduct has resulted in numerous patients contacting Dr. Rosenberg to complain about the way they have been treated since she was removed, and to inquire as to her whereabouts.

92.     By way of example only, one of Dr. Rosenberg's patients is a Queens County Supreme Court Judge.  After her removal, Dr. Rosenberg received a voicemail from the Judge concerning an appointment that her sister-in-law had scheduled with Dr. Rosenberg.  The Judge explained that her sister-in-law encountered "an office being poorly run."  Specifically, the

sister-in-law was checked-in for her appointment and brought into an examining room, de-clothed and was in stirrups prepared for her examination.  At that point, an assistant informed the sister-in-law that her appointment would not be covered by insurance.  The Judge went on to say, "if you are not going to be there, I am not going back."

93.     As another example, on December 27, 2017, one of Dr. Rosenberg's patients wrote a letter regarding her experience with Presbyterian following Dr. Rosenberg's removal. The letter reads, in part:

> On several occasions I have contacted Dr. Rosenberg's office to schedule my yearly examine. I was told that Dr. Rosenberg is on leave and that she would be back after the New Year.  When I called back to reschedule my yearly exam I was told that they did not know when Dr. Rosenberg was returning. Olympia [a member of the Hospital's staff assigned to Dr. Rosenberg] has been answering the phone.   She is rude, unprofessional, and discourteous.  My calls have been disconnected several times and Olympia has been downright nasty when I asked what happened to Dr. Rosenberg.

> The last time I called the office I asked Olympia if everything was alright with Dr. Rosenberg. Her response was that Dr. Rosenberg is on leave and she did not know when she was returning but she would send me to another doctor for my yearly examine. I asked Olympia to get in touch with Dr. Rosenberg and tell her to contact me.  Olympia told me that was not possible. I then asked her if I could get Dr. Rosenberg's email address or cell number to contact her.  Again, she replied that was not possible and tried to get me to see another doctor.

> The    rescheduling   of   appointments,   the   cancellation   of appointments, the rudeness of the staff, the slang language the staff uses and the dress code of the office which gives the impression that you are on a street corner hanging out (i.e.: fake nails like daggers, short shirts, ripped jeans) and not in a doctor's office. The staff's refusal to help in any way was not the way Dr. Rosenberg's practice was ran in the past.

> The reason I have been a patient of Dr. Rosenberg's for over 30 years was because of she always was available, the staff's willingness to help with any situation or squeeze you in to see the

doctor in an emergency.  The office was run professionally; the staff was courteous and helpful.  When you walked into the office the staff was dressed appropriately and professionally and went out of their way to help you, as did Dr. Rosenberg.

I called the office again and had an argument with Olympia about when Dr. Rosenberg was returning and how to get in touch with her or get a message to her. Olympia, in no uncertain terms, told me that I was a patient of New York Presbyterian and not Dr. Rosenberg's. I tend to disagree. I am a patient of Dr. Rosenberg's and **NOT** New York Presbyterian. I resent the fact that I am not able to get any information pertaining to Dr. Rosenberg's return.

94.    The next day, Dr. Rosenberg received an email from another patient which reads:

I wanted to make you aware of an experience I just had with your office.

I called your office today to make an appointment to see you, because I'm concerned about a medical condition that may have developed, and I only trust you!! I have to tell you in the 40 years that I have been a patient of yours I have never experienced such rudeness and disrespect by the women in your office. First of all when I called they put me on hold several times, for long periods at a time. Then when I said I was calling to make an appointment with you I was told, "she's out on emergency leave she's not taking any appointments for the month of January." I asked what was the issue that I was a patient of yours for so many years and her response was we don't know. I asked her for her name she kept responding how can I help you. I asked for her name again, and she responded again how may I help you. She refused to give me her name was very nasty very short and very curt. I asked for a phone number so That I may reach you and she said I don't have one to give you so you can't! I told her that I wanted to make an appointment with you and she responded well we have a new physician here and a new assistant physician. I told her I did not want to see any of her quacks that I wanted to see Dr. Rosenberg. Her response was she's not here so you can't and now I have to see one of the new physicians. I asked her if this office still belong to Dr. Rosenberg and she responded yes it does, so! Then I said so, I want to make an appointment with her and she said you can't! I hung up I was too frustrated.

Each time I call your office I experience this kind of rudeness, what is going on? I know this has nothing to do with you because in 40 years you have had nothing but respectful decent hard-

working people in your office as yourself so I hope everything is
OK with you.

Please advise my dear Dr I need you.

## FIRST CAUSE OF ACTION
### (Interference in Violation of the FMLA)
*Against the Hospital*

95.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the

preceding paragraphs as if fully set forth herein.

96.     At all times relevant herein, Plaintiff was an "eligible employee" within the

meaning of the FMLA.  At all times relevant herein, the Hospital was and is a "covered

employer" within the meaning of the FMLA.

97.     By the actions described above, among others, the Hospital violated the FMLA by

unlawfully interfering with, restraining, or denying the exercise of Plaintiff's rights under the

FMLA.

98.     As a direct and proximate result of the Hospital's unlawful conduct in violation of

the FMLA, Plaintiff has suffered, and continues to suffer, economic and emotional harm for

which she is entitled to an award of damages, to the greatest extent permitted under law, in

addition to reasonable attorneys' fees and expenses.

99.     The Hospital's unlawful actions constitute bad faith, malicious, willful and

wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)
*Against the Hospital*

100.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the

preceding paragraphs as if fully set forth herein.

101.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  At all times relevant herein, the Hospital was and is a "covered employer" within the meaning of the FMLA.

102.    By the actions described above, among others, the Hospital violated the FMLA by unlawfully retaliating against Plaintiff for exercising rights protected by the FMLA.

103.    As a direct and proximate result of the Hospital's unlawful and retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, economic and emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

104.    The Hospital's unlawful and retaliatory actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

105.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

106.    Through the actions described above, Defendants have discriminated against Plaintiff by, in violation of the NYSHRL, subjecting her to unlawful sexual harassment and removing her from her position at the Hospital because of a perceived disability.

107.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of NYSHRL)**
*Against All Defendants*

108.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

109.    Through the actions described above, Defendants have retaliated against Plaintiff because she engaged in protected activity under the NYSHRL.

110.    As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYSHRL)**
*Against Defendant Skupski*

111.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

112.    Defendant Skupski aided and abetted the unlawful discrimination and retaliation committed against Plaintiff.

113.    As a direct and proximate result of Defendant Skupski's unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of NYCHRL)
#### *Against All Defendants*

114.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

115.     Through the actions described above, Defendants have discriminated against Plaintiff by in violation of the NYCHRL subjecting her to unlawful sexual harassment and removing her from her position at the Hospital because of a perceived disability.

116.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

117.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)
#### *Against All Defendants*

118.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

119.     Through the actions described above, Defendants have retaliated against Plaintiff because she engaged in protected activity under the NYCHRL.

120.     As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic and

emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

121.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of NYCHRL)
### *Against Defendant Skupski*

122.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

123.    Defendant Skupski aided and abetted the unlawful discrimination and retaliation committed against Plaintiff.

124.    As a direct and proximate result of Defendant Skupski's unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

125.    Defendant Skupski's unlawful aiding and abetting constitutes malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### (Breach of Contract)
### *Against the Hospital*

126.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

127.     Through the actions described above, the Hospital breached the Employment Agreement, the Sublease Agreement and the Services Agreement.

128.     As a direct and proximate result of the Hospital's breach of the Employment Agreement, the Sublease Agreement and the Services Agreement, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of damages, to the greatest extent permitted under law.

**TENTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
***Against the Hospital***

129.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

130.     Plaintiff and the Hospital entered into numerous enforceable contracts, including the Employment Agreement, the Sublease Agreement and the Medical Services Agreement.

131.     The Hospital owed a duty to Plaintiff to act in good faith and conduct fair dealing under the contract.  The Hospital breached its duty by acting as described herein.

132.     As a direct and proximate result of the Hospital's breach of the implied covenants of good faith and fair dealing, Plaintiff has suffered, and continue to suffer, harm for which she is entitled to an award of monetary damages and other relief.

**ELEVENTH CAUSE OF ACTION**
**(Tortious Interference with Contract)**
***Against Defendant Skupski***

133.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

134.     The Employment Agreement, the Sublease Agreement and the Services Agreement are all valid contracts entered into between Plaintiff and the Hospital.

25

135.    Defendant Skupski had direct knowledge of the Employment Agreement, the Sublease Agreement and the Services Agreement.

136.    Defendant Skupski intentionally interfered the Employment Agreement, the Sublease Agreement and the Services Agreement for wrongful purposes and, as a direct result, the Hospital breached the Employment Agreement, the Sublease Agreement and the Services Agreement.

137.    As a direct and proximate result of Dr. Skupski's tortious interference, Plaintiff has suffered, and continue to suffer, harm for which she is entitled to an award of monetary damages and other relief.

### TWELFTH CAUSE OF ACTION
**(Conversion)**
***Against All Defendants***

138.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

139.    The actions of Defendants described herein amount to an unlawful conversion by Defendants of Plaintiff's medical practice.

140.    As a direct and proximate result of Defendants' conversion of Plaintiff's medical practice, Plaintiff has suffered, and continue to suffer, harm for which she is entitled to an award of monetary damages and other relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

26

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

F.      An award of liquidated damages;

G.      An award of punitive damages;

H.      Prejudgment interest on all amounts due;

I.      An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 14, 2018
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Douglas H. Wigdor
Michael J. Willemin

85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com

*Attorneys for Plaintiff*

28